[Civ. No. 7957. Second Appellate District, Division Two.—September 28, 1931.]

In the Matter of the Estate of ANDREW J. JONES, Deceased. CARRIE LAWRENCE, as Administratrix, etc., Respondent, v. BESSIE R. PRENTICE et al., Appellants.

Victor H. Kendrick and William Dellamore for Appellants.

Frank R. Willis and Will H. Willis for Respondent.

ARCHBALD, J., *pro tem.*—This is an appeal from an order denying proponents' petition to probate a will.

Decedent, Andrew J. Jones, had conducted a hotel and restaurant business for many years, bought and sold homes and engaged in the real estate business until he became financially independent, although unable to read and write, and since 1912 had largely been occupied in taking care of his own properties. He was interested in church work and he and his wife saw much of proponent Bessie E. Prentice in their charitable work, and apparently they became warm friends. In 1923 decedent suffered a serious attack of rheumatism. In 1924 his wife died, the proponent Mrs. Prentice visiting the wife sometimes two or three times a week during her last illness, and when the wife passed away she aided in the funeral arrangements. In the latter part of 1924 decedent, being then about seventy-two years of age, had further trouble with his rheumatism, whereupon he sold two houses

belonging to him, including his residence, and on October 2d started to visit his nephew, Edgar Lawrence, husband of contestant herein and decedent's only living relative. He first visited some hot springs in Wyoming and later went to the home of his nephew in Colorado, where he arrived about January 7, 1925. Inducing his nephew to come to California with him, he returned to Los Angeles about January 14th, of the same year. The nephew lived with decedent and took care of him until about February 20, 1925, at which time the latter was taken to a hospital on account of a severe burn, occasioned by his using a lighted lantern in bed for heating purposes. While in the hospital, and on February 21st, he made a will which gave all of his property, except the sum of $100 cash bequeathed to a church in which he was interested, to contestant's husband, and stipulated that in the event of the latter's death prior to his own such share was to go to a son of his deceased wife's brother. Decedent was later taken from the hospital to a house which he rented, where he lived with his nephew until March 24, 1925, when he moved to the home of proponent Prentice. While living there, and on April 4, 1925, the will which was denied probate herein was executed. The latter part of April decedent and proponent Prentice and her husband moved into a home on East 52nd Street, Los Angeles, which decedent had just purchased, where they resided until August 19, 1928. At about the time decedent moved to the home of Mrs. Prentice and her husband he gave his nephew $200 to tide the latter over until he could get a job, after which decedent relied upon Mrs. Prentice to care for him, instead of the nephew.

Contestant alleged in opposition to the probate of the will filed by proponent trust company that decedent was incompetent to make a will at the time the last one was executed; that at such time he was so weakened in body and mind that he was easily influenced by those having his care, and that proponent Prentice and the attorney who drew the will, who acted as guardians and custodians of his person and property and who were constantly with him and upon whom he was entirely dependent for the care and attention he needed, had and exercised a controlling influence over his mind and will and were able to and did dictate to him what he should do with his property, and that the will

in question was the result of such influence and not the result of decedent's free and voluntary act.

The findings of the court are that the allegations of the contest are true, except as to the allegation that said attorney influenced the execution of the will in question in any way. Appellants contend that there is no evidence to support either the finding that decedent was incompetent at the date of the execution of the challenged will or that the same was the result of undue influence on the part of Mrs. Prentice.

If there is any substantial evidence supporting either finding the judgment must be affirmed, as also it must if there is a conflict in the evidence supporting such finding.

Some thirteen witnesses, including the nephew mentioned, since deceased, testified for contestant. One of them, W. J. Cudger, who the record shows was an intimate acquaintance of decedent, testified that the latter was a religious fanatic, but that he "would not consider him insane". Two others, Estelle M. Porter and Carrie Lawrence, the latter being the wife of the nephew, Edgar Lawrence, and the first being superintendent of the hospital to which decedent was taken when he burned himself, did not express any opinion as to decedent's soundness of mind. The other ten each said that in their opinion decedent was of unsound mind. Two of such witnesses were physicians, one being a friend, and the other eight qualified as intimate acquaintances. Edgar Lawrence, the nephew and only heir, gave as his reason for such opinion that decedent was "full of rheumatism; he could not walk"; that he was "notionable"—meaning, as he expressed it, that "he wanted everything his way"; that he wanted the house overheated; that he put a lighted lantern in his bed and burned himself. The witness testified, with reference to the latter incident, that he, the nephew, lit the lantern and gave it to decedent when requested so to do, and that that was the first time he, the witness, made up his mind his uncle was of unsound mind. Yet the record shows that after that the witness was in the room at the hospital when decedent made the will in the former's favor. Lawrence also testified that decedent did not know he was burned—that he had a pain but "didn't know what it was"; that he was disagreeable to get along with and did not want to stay in the hospital; that he

transferred the bank account on which the witness could draw checks into the name of decedent's trusted attorney, Mr. Dellamore, and "kept Mr. Dellamore over me"; that after the witness and decedent had been at "Mother Felix's" home (after leaving the hospital) a few days "he became cranky" and would not let anybody be in the room; that while decedent was in the hospital "he told me to go and look and see if I could get a house. He suggested it first. He didn't want to stay in the hospital. He wanted to rent a house and instructed me to go out and rent one. Pursuant to those instructions we were searching three or four days. We kept reporting back to him. He seemed to grasp what it was all about." According to the understanding of the witness, a man could be said to be of unsound mind who "is not capable of doing his own business".

Cyrus Simpson, decedent's chauffeur, testified that decedent was a degenerate—explaining that he was "immoral"; that he went to the hot springs in Wyoming in the winter time; that he belonged to almost every Christian organization in Los Angeles; that he was "notionate" at times and "irrational all the time I knew him"; that he was "irrational when he was running his restaurant business" (the witness did not specify any acts which he denominated "irrational"); "He didn't do the right thing by me." The witness complained because he was not paid as he thought he should have been for his services and was not remembered in decedent's will. We will not quote, summarize or comment on the testimony of the other lay witnesses, more than to say that their testimony for the most part was similar to that we have quoted, except that one or two of them added that decedent would catch cats and burn them and dead chickens in the cookstove—this in 1912—and bring turkeys in the room where his sick wife was and then turn them loose; that he would sit by the fire after he had a bath and talk to himself—would laugh and talk to himself for twenty minutes at a time—and that sometimes in the Holiness Church he would talk in "this unknown language and almost break up the meeting".

Such testimony falls far short of furnishing any basis for the opinion that decedent was of unsound mind in the sense that he lacked testamentary capacity, and of

course the opinions of lay witnesses are no stronger than the reasons given for them.

Dr. Gordon, the physician who attended decedent at the hospital, testified that he had known decedent "from 1916, off and on, until February, 1925"; that "I thought when I saw him in 1925 he was of unsound mind"; that he based this opinion "on having known him before, and having known that he was a man of good judgment, of ideals, and was cleanly about his person, rather proud I might say; that then, the last time I saw him (in February, 1925) he had changed to a marked extent". The witness evidently thought it was lack of good judgment that led decedent to make "the trip in the dead of winter in Colorado and Wyoming", and to place the lighted lantern in bed with him the night he was burned. The witness also said decedent "was rambling" in his talk and "would go from one subject to another, his ideas were not clear"; that "while his mental condition was a secondary condition to me at that time, because of the severe burns he had, and I was treating him for the burns", the "opinion as formed at the time was simply that his mind was deteriorating"; that "his sight was very poor" and "his eye reflexes were absent"; that at that time he was "dirty about his bed and about his things around; and he did not have a cleanly aspect at all". The witness testified that in the hospital, if no one happened to be in decedent's room when the former entered, "I would find him lying and looking over the wall and holding a regular conversation", and "he did not seem to know anything about it"; that "as I would talk to him he would ramble off into something else part of the time"; and "I would ask him about dressing his wound, or if his bowels had moved, or something of that sort, and he would not know anything about it"; that "in talking of that trip he had made, to him it seemed that he had just come back from it"; that "all those things tended to give me the idea that his mind was not sound". The doctor testified that he had made no special study of mental disease and did not consider himself an alienist or psychiatrist; that decedent was suffering from "senile dementia"; and that he first concluded the latter's mind was unsound during his first visit after the burn, February 19, 1925.

Dr. Charles S. Diggs was one of the owners of the hospital where decedent was treated, and observed him for about three days after Dr. Gordon was discharged. The doctor testified that from his observation of the patient for the three days he looked after him he formed the opinion that decedent was of unsound mind. The reason for this, he said, was that decedent seemed to think Dr. Gordon was "trying to take advantage of him in some way and mistreat him"; that "he had delusions" regarding the doctor; that sometimes "he would be muttering when I would go in and talk to him; and, of course, I did not think a sane man would do that". "He was suffering from senile dementia". The doctor further testified that the third day he went in to see his patient "he was all up in the air about his hospital fees, and saying he would have to leave this place because it was going to take all of his money and he could not stay there; he had to go somewhere; these fellows were trying to take advantage of him". "He said the hospital fees were too high."

Dr. Williams, a dentist who had known decedent for five or six years and who pulled sixteen teeth for him in January, 1925, testified that in his opinion decedent was of unsound mind "in the latter state of his life"; that when he first knew decedent "he used to speak of the growth of Los Angeles and its beauty and tell how he made good in the restaurant business, and later there was a marked change in his mental condition"; that he would speak "about people, his friends and relatives, and the 'gang', as he called it—they were all trying to beat him out of his money". "He said the gang took advantage of him, they were trying to prove he was crazy." (This was after the execution of both wills and after the guardianship proceeding.) The witness said: "I don't know that I could say there was any special act he did which caused me to believe he was of unsound mind"; "he would be talking about his property at one time and then he would jump off and talk about his relatives and then talk about my fixing his teeth—bring all those things up in one conversation". Dr. Williams also said that his understanding of the words "unsound mind" was that they applied to a man who was "not capable of taking care of himself or his business affairs"—which is not the true standard of testamentary

capacity. (*Estate of Sexton,* 199 Cal. 759, 768 [251 Pac. 778].)

The picture we get from the testimony of the last three witnesses mentioned is that of a physically handicapped man of a ripe old age, who nevertheless seemed to retain a rather vigorous mentality and will power. There is not a thing in the testimony of the two physicians inconsistent with testamentary capacity, although the mental condition might not measure up to the witnesses' ideas of complete sanity from the medical standpoint. Decedent might have been suffering from "senile dementia", as they both testified, and so in their opinion have been mentally unsound, and still it would not be "the sort of incompetency or insanity which, in the estimation of law and of men of ordinary sagacity and prudence, renders a person incapable of executing contracts or making a will". (*Estate of Purcell,* 164 Cal. 300, 306 [128 Pac. 932, 935].) The evidence in this case shows without contradiction that decedent, after leaving the hospital and after making the will in question, exchanged a note and mortgage for $10,500, owned by him, for the property in which he lived until the time of his death. He first looked at that property in company with his nephew and apparently liked it. The person from whom he purchased it testified that "he hit the walls to see if the walls were solid", and otherwise acted in examining the place like a man who had ample mental capacity to do business. This was before he went to the hospital, and he visited it again after he came out of the hospital. At that time he looked around again and asked how soon he could move in, exchanging "a mortgage for $10,500" for the place, although the owner had held it for $11,000. He apparently impressed the owner, as she testified: "Mr. Jones on the occasion that I saw him appeared to be rational. Of course, I consider an old gentleman like that, who talks like that and investigates things like that must have been of sound mind. He did not refer to his attorney." But when it came to the point of escrowing the papers he turned the matter over to his attorney to attend to, which, we may remark incidentally, showed good judgment. The attorney, Mr. Dellamore, was the one who drew the questioned will, as well as the prior one, and acted as a witness thereto. He testified how he was called to decedent's home

at the time of the purchase of the property mentioned. "At that time I called there he discussed the matter of the purchase of his home. He had arranged to buy this home on East 52nd Steet and he wanted me to take care of the escrow on his behalf. He said Mr. Holzel (the seller) would be at the Bank of Italy at 7th and Broadway the following day and for me to . . . take care of his side of the deal. He told me of his plan, how he had a mortgage of $10,500 on a piece of property on North San Pedro Street and how he had negotiated the exchange for the East 52nd Street property for this note and mortgage, an even exchange. . . . He said, 'Here I have a $10,500 note which remains stationary in value', or words to that effect, 'and I am getting a nice piece of property which in my opinion will advance in value'. He said, 'If I went into the open market to sell this mortgage and note very likely I would have to discount it from 10 to 30 per cent', and he said he was able to get Mr. and Mrs. Holzel to take it at face value without any discount. He carried on all negotiations for the purchase of the property as far as I know, and he gave me instructions as to just what he wanted about the insurance . . . and that I should examine the deed which they (Mr. and Mrs. Holzel) were to put in escrow, to see that everything was regular. . . . In my opinion Mr. Jones at all times seemed to be of sound mind and in my opinion was of sound mind on April 4, 1925, the day he executed the will. My reason for that belief is the general intelligence displayed by Mr. Jones on all my visits to him and on his calls at my office. He was perfectly rational and intelligent in all his remarks to me." Mr. Dunlap, the other witness to the will, had known decedent since 1910. He said: "In my opinion Mr. Jones was of sound mind on April 4, 1925. . . . On April 4, 1925, he appeared to me to be rational. He appeared sound to me. When I was called into the room Mr. Jones said, 'I am making a will and I want you to sign it'. He told Mr. Dellamore the reason he wanted me on his will; that he knew me for a long time and I was right there and he didn't have to go out and find somebody."

About fifteen other witnesses, including Dr. Barker, who was called in attendance upon decedent after he had discharged his doctor at the hospital, and who attended him

almost constantly until his death, and Dr. Speicher, who attended him on several occasions after decedent left the hospital, all testified that decedent was of sound mind at the date the will was executed; and while in some particulars that have no bearing on decedent's mental condition, and yet which seemed to enter largely into the formation of the opinions given by contestant's witnesses, they corroborated the testimony as to the physical condition and cranky, determined characteristics of decedent, in other particulars their reasons had a sound basis for the opinions given. ■ We are forced to the conclusion that the opinions of contestant's witnesses, founded as they are upon reasons that have no real bearing on the testamentary qualifications of decedent, do not amount to evidence of lack of such testamentary capacity and do not create a conflict with the positive and undisputed evidence of acts of decedent that required more mental capacity than the making of a will, performed by him at and about the time the will was made, with·which the record in this case abounds. And even if they be considered sufficient, standing alone, to sustain the judgment, they would, ''In the light of all the facts, be wholly inadequate, and that without invading the province of the jury as the judges of the weight and sufficiency of the evidence.'' (*Estate of Casarotti*, 184 Cal. 73, 78 [192 Pac. 1085, 1087].) Here there was no jury, but in our opinion such statement is applicable for the reason that there is no real conflict between the testimony of such witnesses and that of the attesting witnesses. Dr. Gordon does not even attempt to say that the rambling talk, the changing from one subject to another and the cloudy ideas were conditions which existed at all times, or even at all of the times he visited the patient, and the last time he saw him was about two months prior to the execution of the will. In addition to the conclusions of the witness mentioned, the witness related the substance of conversations which he had with decedent at the latter's home before he went to the hospital, and in the hospital, which show very clearly that such conditions did not prevail at all times, and so cannot conflict with the undisputed testimony as to acts of decedent occurring after the doctor was dismissed by Mr. Jones as well as at the time of the execution of the will. The same is true of the testimony of

Dr. Diggs, who relates incidents showing that the patient was not by any means either affected by any delusions or mental unsoundness that incapacitated him from making a will, even at the time he was still in the hospital, to say nothing of two months thereafter. Dr. Williams, in addition to having the wrong idea of the test of testamentary capacity, gives the substance of conversations with testator that are consistent only with the possession of a mind having such capacity. We are disposed to say here of the testimony of the two doctors what the Supreme Court said in the case of *Estate of Collins,* 174 Cal. 663, at page 670 [164 Pac. 1110, 1112] : "It is obvious that the physicians who gave their opinions that she was of unsound mind were measuring it by a more exact and perfect standard than is required by law: the mind wholly normal and healthy, free from any defective condition arising from disease or decay. In a medical sense anything short of this may constitute insanity or unsoundness of mind; but the law does not demand such perfection to manage one's affairs and make valid dispositions of property. . . . "

"But mere proof of mental derangement or of insanity, in a medical sense, is not sufficient to invalidate a will. The contestant is required to go further and prove either such a complete mental degeneration as denotes either incapacity to know and understand those things which the law prescribes as essential to the making of a valid will, or the existence of a specific insane delusion which affected the making of the will in question." (*Estate of Russell,* 189 Cal. 759, 769 [210 Pac. 249, 254].) In our opinion contestant has failed to do this.

■ Is there any evidence to support the finding of undue influence? The written contest charged Mrs. Bessie E. Prentice and William Dellamore with using undue influence on decedent in various ways, with the result that the will in question was executed contrary to the testator's real intention. The findings are to the effect that all the allegations of the written contest are true except as thereinafter expressly found to be untrue. It is expressly found to be untrue that said Dellamore exercised any undue influence over decedent at any time, and, further, that at all times mentioned in said contest said William Dellamore "acted as attorney and counselor for said Andrew J. Jones in

the conduct of his business and the preparation of said will in a proper, unbiased and ethical manner and independently of Bessie E. Prentice, and without any collusion on his part with said Bessie E. Prentice''. The undisputed facts immediately surrounding the execution of the will are as follows: While decedent was in the hospital he rented a house on East Santa Barbara Street, Los Angeles, and his nephew moved him there from the hospital and took care of him at that place. Apparently the nephew's wife had been sent for and she arrived just before decedent went to the hospital. She had stopped in Arizona on the way out and ."got her daughter and her daughter's man, and brought them with her''. It seems the daughter had a child. When they called at decedent's residence he wanted to know how many came. He was told, ''three women, a child and a man'', to which he said, ''My God, I didn't send for an army.'' Decedent complained of the noise at the Santa Barbara Street place and insisted on moving. Negotiations were then in progress for the purchase of his home, and Mrs. Prentice offered him a room in her establishment during the interim, to which he went. Apparently before leaving the Santa Barbara Street house decedent became dissatisfied with his nephew, and as the nephew expressed it, ''the old man had fired us out''. Before this the nephew was authorized to sign checks on decedent's bank account and did draw money therefrom on a few occasions at decedent's request. After the incident referred to, however, decedent called in his attorney and arranged to have the latter take charge of the bank book. Decedent gave his nephew $200 at that time ''to go back to Durango [his former home] with or to do what I wanted''. On April 4, 1925, while decedent was living in the home of Mrs. Prentice, he said to her: ''Call my attorney and tell him I want to have a conference with him'', with which request Mrs. Prentice complied. Mr. Dellamore came out, telling Mrs. Prentice that he had come in response to Mr. Jones' call. He went into decedent's room and closed the door and was in the room alone with decedent until the will was ready to be witnessed, when Mr. Dunlap was called in for that purpose.

With regard to communicating the purpose of his visit to Mrs. Prentice the witness Dellamore said: ''I did not

tell her anything about the will having been drawn. . . . I told no one anything concerning Mr. Jones' business at any time. . . . I felt that was a confidential matter and that no one should know anything about it.'' He further said: ''At the time of his [decedent's] disagreement with Lawrence he had all his relationship cancelled. Mr. Jones had a disagreement with Mr. Lawrence, I think, during the month of March. I didn't investigate or ascertain what that disagreement was. I didn't think it was any of my business. Mr. Jones stated several times to me that he was disappointed in Edgar; that he was not the boy he thought he was and that he was through with him, and that was the reason for the cancellation of any business relationship which he had prior to that time with him. That was the reason for changing the will. He said he was through with Edgar and didn't want him to have any more of his property and that on account of his disappointment he was satisfied that he was not the boy who should profit by his prior frugality and industry.'' Mr. Dellamore took the will with him when he left the house and kept it until after the testator's death. Mr. Dunlap, the other witness to the instrument, testified that he was called into the room on that occasion. Mr. Jones, Mr. Dellamore and himself being the only ones present, and that the door was shut; that Mr. Jones told him he was making a will and was glad he got there in time ''to sign my will—be a witness''; that nothing was said in his presence about the way he wanted the property to go, but he was sure Mr. Dellamore read the will to him—''but I was not paying attention''; that Mr. Dellamore asked decedent if that was his last will and if he was satisfied with it, to which Mr. Jones replied ''he was''; that after the execution of the will he left.

It is apparent from the foregoing that at the time the will was drawn the testator was not in the immediate presence of the beneficiary charged with exerting the undue influence of which it is alleged to be the result, but was in the presence of his personal attorney, who also drew the first will, who was familiar with his affairs and who was found by the court to have acted in so doing in a proper, unbiased and ethical manner and independently of and free from any collusion with said beneficiary. There was consequently no such influence exerted at the time the will was

made, and if any such influence was exerted it must have been in poisoning the mind of decedent against his nephew prior to that time and to such an extent that testator was not free from it at the time of the execution of the questioned instrument. If there had been any such influence at work it seems incredible that the attorney, who, as we have said, drew the first will and apparently was familiar with the waning popularity of the nephew, did not observe and correct it, if the dissatisfaction had no foundation in fact and rested only on the supposedly secretly exerted power of the beneficiary over the mind of decedent. As an example of her power over decedent respondent urges that Mrs. Prentice dominated Mr. Jones' mind to the extent of causing him to sign "the two blank checks by which the bank account was transferred to Mr. Dellamore"; but a reading of the testimony of the nephew, referred to in support of such statement, shows that decedent made the demand on Lawrence that the two checks be signed, and did all the talking, and that "Mrs. Prentice was standing over next to the bed and she handed the checks out" after the uncle's demand; that the witness "noticed on the checks there was a cross on one of them", and said, "Anything you want, Uncle. I will sign these checks", which he did and handed them back to Mrs. Prentice. As a further evidence of such domination the brief of respondent quotes from the testimony of Lawrence a statement which he says was made by Mrs. Prentice to decedent, viz.: "That is your nephew, make him do what you want him to do." The nephew evidently did not consider it as "domination", for he immediately said, following such statement: "I have nothing against Mrs. Prentice. Mrs. Prentice and I always got along well. She always talked to me like she would to her own son. I was respectful to her. *She didn't talk bad against me,* only that she would say, 'He is your nephew; make him do what you want him to do'."

Mrs. Carrie Lawrence, widow of the nephew and administratrix of his estate, as well as respondent herein, is quoted in support of the finding of domination: "I am the wife of Edgar Lawrence, the contestant herein. I came to California March 12, 1925, and located on East Santa Barbara Street, a place secured by Mr. Jones. Mr. Jones was there at that time. I was there two weeks. Mrs.

Prentice was there at that time. Mrs. Prentice was in the room where uncle was. She was hugging and kissing him. She was a stranger to me then. I went out and asked my husband who she was. He said she was a particular friend of uncle's. I said to him, 'Well, you will soon see what your uncle's particular friend will hand you'. She was there every day, and when she would come and go we could not have any control over him whatever. He was just cross and hateful as could be. He was very disagreeable. You could not get along with him if she was there." It might be inferred from such testimony that Mrs. Prentice was forcing her attentions on decedent, as "she was there every day". This inference, however, cannot be indulged. The nephew, a very interested witness in voiding the will, clearly explains why she was there so much, and in this corroborates the story of Mrs. Prentice herself. He says: "While at the Santa Barbara Street house he [decedent] was always sending for Mrs. Prentice", and "he was cranky at times when I did not send for Mrs. Prentice— when he wanted her to come". A careful reading of the evidence discloses only a few visits made by Mrs. Prentice except at the request of decedent, and seems to show that instead of being the "pursuer" she was the "pursued".

Respondent's brief further says that Mrs. Prentice dominated the mind of decedent to such an extent "that she rented a house and caused him to be moved away from the Dunbar Hospital about March 3, 1925", and quotes the superintendent of the hospital as saying that decedent "was remarkably satisfied in the hospital until Mrs. Prentice came in and talked to him; he didn't say anything about getting out of the hospital" until after she talked to him. Just how all this could have any bearing on the act of executing the will we fail to see, but in the face of the evidence of all the other witnesses that decedent strenuously opposed going to the hospital in the first place, and his continually expressed desire to leave, as shown by the testimony of the hospital doctor, the nephew and others, it is positively stamped as the conclusion it appears to be. So far as the renting of the house is concerned, the evidence shows that decedent had his nephew and a number of friends looking for one. The nephew found a place that had two rooms and a kitchen, in which decedent and his nephew and

wife were supposed to live, but no private room for decedent. Mrs. Lawrence and Mrs. Prentice both said it was "not private enough", and they reported the situation to decedent, who "said no". Mrs. Prentice testified that Lawrence was with her when the Santa Barbara house was rented, but even if he was not it would not seem to be material on the question of undue influence.

Nowhere in the evidence have we found where anything that might be considered derogatory of the nephew was said by Mrs. Prentice, except in the testimony of the superintendent of the hospital, whose conclusion was that Mr. Jones was satisfied at the hospital until he talked to Mrs. Prentice. She testified that Mrs. Prentice came in to see Mr. Jones the day after the first will was made, "and told Mr. Jones that if he would change his will and make her administrator she had a room in her house and she would take Mr. Jones in and look after him in his lifetime, because the nephew was not capable of looking after him". In answer to this the witness says Mr. Jones "didn't say very much of anything; just laid there and listened". The witness also said that outside the door "Mrs. Prentice said to me that if I could get Mr. Jones to leave the hospital she would get him to do what she wanted him to do and have". These statements all stand denied, but giving them the full effect that we must, they show in the first instance an attempt merely to influence decedent to appoint Mrs. Prentice executrix of the will just made, which did not seem to have any effect so far as results are concerned. The statement made as to the ability of the nephew to care for decedent would seem to be true, from the evidence before us, as he lighted the lantern upon the occasion above mentioned and gave it to decedent, with the disastrous result following. The last statement would seem to be but a statement that if Mrs. Prentice had decedent out of the hospital she could make him do what she wanted, the only thing disclosed as having been then wanted was to be made executrix. Nowhere in the evidence is there a word, other than quoted, that we have been able to find, said to the decedent or to anyone else, in any way derogatory of the nephew or that could in any way be said to have prejudiced decedent against him.

It is also said that "in order to perpetuate her domination over the mind of decedent" Mrs. Prentice "attempted to prevent intimate old friends from visiting A. J. Jones". The testimony of Cyrus Simpson, the chauffeur, is referred to in support thereof, and is as follows: "I visited him [decedent] at Mrs. Prentice's house. They attempted to stop me from visiting him, but they didn't succeed. I went in myself. The first time Mr. Prentice was the first one who attempted to stop me. Mrs. Prentice did not try to stop me, but she made things so unpleasant I didn't go around." Such evidence certainly falls short of showing an attempt to keep old friends away. The record fails to show that any old friend was kept away from decedent, and no one complained of not being able to talk freely with him except the witness W. H. Joyce, who testified for contestant. Mr. Joyce stated that when he would visit Mr. Jones Mrs. Prentice "would come in and sit, or if she did not come in Mr. Prentice would come in and sit. In between that time he managed to say, 'I want to change that will; I don't want it, but I have to do these things to keep peace'." No others, however, seemed to have any such trouble, and possibly these two witnesses, for some reason personal to decedent or the Prentices, were not welcome visitors. The declaration of decedent testified to by the last witness mentioned certainly shows that the former knew of the existence of the will, and it is passing strange that he said nothing to his nephew about wanting to change it or to the trusted attorney who drew it.

We must remember that this is not a deathbed will. Decedent left the hospital March 3, 1925, the will was made April 4, 1925, and decedent passed away August 19, 1928, more than three years thereafter. The testator was evidently a man of strong will. His nephew says of him: "The fact of the matter is that Mr. Jones was a man of very firm will. When he wanted anything he wanted it. . . . He directed me from time to time about his wants. I wouldn't have to ask him what he wanted. He told me what he wanted. . . . He was very strong in his instructions." We fail to find any evidence to support the finding that the will was the product of undue influence. █ There is evidence which, taken by itself, might give rise to suspicions of undue influence, but we fail to find any that could be the

basis of an inference of that nature. There is nothing we have been able to find in the record which conflicts with the clear, convincing evidence as to the execution of the will, and any other evidence "falls far short of showing such undue influence as in effect destroyed the testator's free agency and overpowered his volition at the time of making the will." (*Estate of Shay*, 196 Cal. 355, 363 [273 Pac. 1079, 1082].) "Mere proof of opportunity to influence the mind of a testatrix, even though shown to be coupled with an interest, or a motive to do so, does not sustain a finding of undue influence in the absence of testimony showing that there was pressure operating directly on the testamentary act." (*Estate of Stump*, 202 Cal. 308 [260 Pac. 543].) It is evidently, as we have said, the theory of respondent that the supposed influence of Mrs. Prentice affected the decedent at the time the will was made. The language of the Supreme Court in the case of *In re Langford*, 108 Cal. 608, at 615 [41 Pac. 701], is peculiarly applicable to such a contention, under the facts of this case: "The contention of respondents, when thoroughly sifted, seems to be about this: That there is evidence to the point that appellant had a *general* influence over the deceased which ought to be classified as 'undue'; and that, therefore, although when he made his will, under the circumstances above stated, he was apparently free to act as he pleased, yet it must be inferred that this general influence of appellant accompanied him, subverting his volition and coercing him to act against his real wishes. To maintain such a strained and difficult theory would require evidence very different from that presented in the record."

Order reversed.

Works, P. J., and Thompson (Ira F.), J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on October 27, 1931, and a petition by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on November 25, 1931.