[Civ. No. 1277. Fourth Appellate District.—February 5, 1934.]

In the Matter of the Estate of W. S. HOPKINS, Deceased. CARRIE HOPKINS, Respondent, v. E. L. HOPKINS, as Executor, etc., et al., Appellants.

Harris & Hayhurst, L. B. Hayhurst and Rue C. Gibson for Appellants.

B. W. Gearhart and Lindsay & Gearhart for Respondent.

BARNARD, P. J.—W. S. Hopkins, usually called Earl Hopkins, died on August 4, 1931, leaving a will executed on July 18, 1931, which was duly admitted to probate on August 21, 1931. On February 3, 1932, the contestant filed a petition asking that the probate of this will be revoked on three grounds, to wit: That the deceased was of unsound mind on the day the will was executed; that the will was procured by the undue influence of Dr. E. L. Hopkins; and that the will was procured by false and fraudulent representations made by Dr. E. L. Hopkins. A jury found in favor of the contestant on each of the grounds named. The proponents moved for judgment in their favor notwithstanding the verdict. This appeal is from an order denying that motion and from the judgment entered, and is based entirely on the insufficiency of the evidence. This contention will be considered in connection with the several grounds of contest in the order named.

The deceased, who was about sixty years of age at the time of his death, had lived for many years in a small house owned by his brother, Dr. E. L. Hopkins, on the

rear of the lot on which his brother's home was situated. He was married to the contestant in 1925 and from that time until his death they occupied the same house, the deceased paying his brother $15 a month rent. The two families were on terms of intimacy and went on frequent trips and picnics together. In 1926 the deceased made a will leaving all of his property to the contestant and appointing her executrix without bond. This will also provided that in the event the contestant did not survive him the property should go to Dr. Hopkins and another brother, and that in the event the contestant was unable to act as executrix, Dr. Hopkins should act as executor without bond. On July 18, 1931, the deceased made the will here in question, under the terms of which $1,000 was left to a nephew on a certain condition, $5,000 in cash to the contestant, and the rest of the estate given to Dr. Hopkins in trust, all of the net income to be paid to the contestant during her lifetime, and at her death the remainder to go to Dr. Hopkins and a sister of the deceased. Dr. Hopkins was appointed executor without bond.

We will first summarize the evidence relied upon by the contestant as showing that the deceased was of unsound mind at the time the will was executed. The deceased quit his job about the middle of May, 1931, on account of his health and all of the witnesses are agreed that he was very much concerned over his physical condition and that he thought he was going to die. The contestant testified that her husband always had great affection for her; that he had been failing for over a year and gradually grew worse; that he thought he had cancer and heart trouble; that before they were married she went with him to see a doctor who told him he had a nervous heart; that she first noticed him failing mentally during the last three or four days of April when, after turning a handspring, he remarked "I am all shot"; that he was very restless and could not sleep; that he would beat his head with his hands until it was black and blue; that he once remarked that he could not do anything but think; that at one time he threatened to commit suicide; that he became very nervous when anyone came around and did not talk very much; that during the last few months he objected to going out with her friends, saying he did not want anyone to know he was so nervous and

was failing in health; that once while they were riding in an automobile he insisted on getting out and running until he was exhausted; that he did not want to see a doctor, thought they could do him no good, and did not believe what they told him as to his condition; that she called in one doctor without his consent; that Dr. Hopkins took him to another doctor; that he had recently had his upper teeth pulled and a temporary plate put in which was causing him much annoyance; and that he was very nervous on July 18th and was having his teeth fitted about that time.

The doctor called in by the contestant, an osteopath, testified that he treated the deceased on June 29 and on July 1, 1931; that the deceased told him he was having difficulty with his heart and his digestive apparatus and that the only way he could get any sleep was to get out and walk until he was exhausted; that the deceased was very depressed and complained of an inability to swallow; that he diagnosed the trouble as melancholia; and that the inability to swallow was characteristic of such a nervous condition. He concluded that he was unable to say whether or not the deceased could have transacted ordinary business. The doctor to whom the deceased was taken by his brother testified that he made a thorough physical examination on July 14, 1931, and visited him on July 16th and again on July 23d; that the deceased thought he had something growing in his stomach which he thought was cancer and also thought there was something wrong with his lungs; that he had previously treated him for a peculiar growth on the back of his hand which resembled a skin cancer, about which the deceased was very much worried; that at the time of the examination the deceased thought he had another cancer growing in his stomach; that this examination revealed nothing wrong of a pathological nature but indicated that his condition was the result of nervous tension; that he did have indigestion and a pressure on his lungs which extended into the esophagus; that this pressure was not due to a growth but was due to nervous tension and to gas formation; that he was suffering physically, but this suffering was caused by the nervous tension which in turn was caused by worry; that the patient told him he had worried over the depreciation of stocks and bonds to the extent that he could not eat or sleep; that he had the idea he was going

to die and asked if he better make his will; that the worry and nervousness produced the feeling which made him think he had cancer of the stomach, cancer of the throat and lung trouble; and that his talk indicated that he understood everything perfectly and that there was nothing in his attitude outside of extreme nervousness.

Other witnesses who testified as to the mental condition of the deceased during this period include the following: One witness testified that he observed a difference in his mental capacity about the time he stopped working; that one day he came to his office and wanted to sell a mortgage at a discount of $400 in order to invest the money in San Joaquin Light & Power stock; that he considered him crazy because he wanted to discount such a mortgage to that extent; and that toward the last he had a way of winking his eyes, was very nervous and could not sit still. Another witness testified that she had always found him very friendly; that he was all right except for being nervous until a few months before his death, but that on July 18, 1931, she thought his mind was unsound. As a reason for this belief she stated that shortly before he went to Santa Cruz he would sit on the floor, instead of on a chair, and tear up pieces of paper; that at other times he would roll up and unroll his belt; that he told her he was not going to live, that he was all shot to pieces, that he could not sleep, that the doctors could do him no good, that he had heart trouble, a cancer and a big lump in his throat, and that he could not get his breath good; that he would hit his fingers upon his head and run his fingers back and forth on his head and continually blink his eyes; that he was in a very nervous condition; that he told her that he would not care to live if he could know that his wife was taken care of; that he talked a great deal about his financial affairs and was worried about money losses; that sometimes when she talked to him he answered and sometimes he did not; and that on one occasion she found him outdoors talking to himself. Another witness testified that he thought he was of unsound mind in June and July, 1931, because when he attempted to converse with him he would be twitching his hands, tearing papers in small pieces and laying them on the ground, and because sometimes he would leave in the midst of a conversation and after being gone about

five minutes would return and resume the conversation. That at times he seemed to be in a study and would leave after making a few general remarks. Another witness testified that she noticed a change about May 30, 1931; that he was then very nervous and had very little to say; that he would sit on the floor, play with his belt and only answer the questions she put to him; that during the latter part of June, while they were at a picnic, he was very nervous and after he ate went over and laid down under a tree and did not talk with the others; and that she saw him on July 20th, at which time he did not speak at all, just walked around with his face twitching and his eyes snapping and was very nervous. For these reasons she thought he was of unsound mind. Another witness testified that he changed during the last year; that he did not have much to say; that he was always in a hurry; that he could not relax; and that just before he went to Santa Cruz he did not return her greeting when she spoke to him. Another witness testified that while she could not say whether he was of sound or unsound mind she had noticed that he would drum his head, would sometimes not complete a sentence, would answer sometimes when spoken to and sometimes not; that his face would twitch and his eyes blink; that he was always worrying about his investments, especially about stocks going up and down; and that he told her he was so weak and ill he could not eat, that he was all shot, and that he did not want to have his teeth pulled but was forced to do so. Another witness testified that she thought he was of unsound mind during the last three weeks of July, 1931, because he was cast down and not a bit sociable; that she had seen him mumbling to himself, sitting on the floor and tearing papers; and that he had a great fear of having a stroke as his mother had had one. Another witness testified that she had seen a great change in his mental capacity during the last year of his life and that she thought he was insane during the last two months. As reasons for this opinion she stated that one day before he quit work you could tell he was nervous by the way he ate; that once at a picnic he went off and laid down under some trees and would not talk to the others; that later that evening he would not eat, saying he was not hungry; that on one oc-

casion he would not speak to her; and that she had seen him sit and rub his head.

Other witnesses testified that he complained of being sick and constantly was worred over the decline in value of stock and other securities; that he frequently expressed a willingness to die if he could be sure that his wife would be taken care of; that he was more preoccupied and his face twitched more than formerly; that he had always blinked his eyes but this grew worse during the last few months; and that he had always preferred to sit on the floor even when chairs were available.

A few days after the will was signed the deceased and his wife went to Santa Cruz for a vacation. The deceased drove his own car but they were accompanied by Dr. Hopkins and his wife in another automobile. The four stopped for lunch at Gilroy and while they were eating lunch the deceased spoke of his mother who was buried in their family plot near that city. At this time he broke down and cried and told the others that if he should die they would not have far to take him to bury him.

The contestant also relies on the fact that the deceased may have committed suicide. While on the vacation at Santa Cruz and on Friday morning, July 31st, the deceased disappeared. After an intense search his cap was found one evening and the next morning, August 4th, he was found in the hills back of Santa Cruz at the foot of a rather steep incline and lying among some rocks, this place being about seven hundred feet from where his cap was found. He was still alive and recognized his brother but died that afternoon. Whether his death was the result of an accident or by suicidal intent has never been determined.

There was evidence on behalf of the proponents to the effect that the deceased continued to take care of his private business up to the time he left for Santa Cruz, a few days before his death; that he anxiously read market reports in the papers until the last; that he kept a book in which he systematically recorded all of his investments and in which he carefully entered all changes and all interest and dividends received; and that this contained a number of entries during June and July, including one on July 17th and two on July 15th. These entries were all in his writing although his wife testified that she assisted him during the last few

months, although he usually held the book on his knee and did the writing. He had a lock box in the bank which he entered on July 10th, July 18th, July 22d and July 23d. Before making a new will he talked to several people about making a will, and told a number of people that his only concern was to see that his wife was taken care of for life. He consulted Dr. Cooper about the best way to leave an estate, asked his advice and told him, "I want my wife taken care of but I am afraid if I leave it all to her somebody will get it away from her." Dr. Cooper advised him to create a trust for the benefit of his wife. The contestant testified that the deceased continually told her that he was afraid that crooks would take the money away from her; that he did not think she would be able to handle it and that he wanted to have things fixed so she would have everything and that he was trying to fix it so she would get everything and so no one would be able to take it away from her. More than once he spoke of another woman, a Mrs. Swift, who had had an unfortunate experience of that nature.

The deceased's attorney had offices adjoining his brother, Dr. Hopkins. At his request his brother made an appointment with this attorney. On the morning of July 15 or July 16, 1931, the deceased went alone to the office of this attorney and gave him the data for drawing this will. This attorney testified that no one else was present and that the deceased told him what he wanted put in the will; that everything contained in the will was suggested by the deceased, with the one exception that will be noted; and that the deceased told him that he wanted to give $1,000 to his brother's son on condition that the nephew take care of his own father, that he wanted to give the household furniture, his automobile and $5,000 to his wife, and that as to the remainder he wanted to create a trust in favor of his wife. The attorney asked him if he also wanted to give his home to his wife and he replied that he did not own his home. While they were talking about the terms of the will the deceased's brother, Dr. Hopkins, came to the door of the room for a moment and, having heard them talk about $5,000, suggested that some time should be allowed in which to raise that amount in cash. This suggestion was followed

and the will provided that it need not be paid for two years. This attorney further testified:

"I discussed each and all of the provisions of the will with him and told him at that time that it would be necessary for me to include in the will a number of things relative to the handling of the property, such as loaning, buying, and selling, etc. I told him I would include those provisions in the will and he could read it and execute it if it met with his approval. I tried to state the substance of what I would put in the will. I told him I would telephone him when I had the paper prepared, and he says, 'I have no telephone—you can send word by the Doctor.' I think I went in the Doctor's office the afternoon before Earl signed it and told Dr. Hopkins to tell Earl I had the will prepared and left a copy of the will and asked the Doctor to take it to Earl so that he might read it over at his leisure and see whether it was satisfactory. Earl came in the office next morning. I told him I had the will prepared and said 'now you better sit down here and I will read it over to you'. He sat there and I read the will from beginning to end. He asked me some questions about some parts of it and I remember particularly of explaining the spendthrift clause which is the ninth paragraph of the will to him. I told him that provision was for the protection of Mrs. Hopkins; that it prevented attachments and incursions into the estate prior to its payment to her and he seemed to think it was a good provision. He seemed to understand the will thoroughly and I says, 'Is the will satisfactory to you Earl in every respect.' He said it was, and I asked him if he was ready to execute it and he said yes, and I said, 'If you will call your witness we will execute it.' He went out of the office and came back pretty soon with Mr. Baird. I spoke to Mr. Baird and says, 'Earl is making his will— and he wants you and me to act as witnesses.' Mr. Baird said 'All right,' and I says to Earl, 'Do you declare this to be your last will and testament,' and he said he did, and I asked him if he requested Mr. Baird and myself to attest it as witnesses and he said he did. He signed it and Mr. Baird signed it next and I signed it last, although my name appears above Mr. Baird's on the will. No one other than those whom I have just mentioned were present in my office at the time of the execution of the will"

"I folded the will and put it in an envelope on which I had written 'last will of W. S. Hopkins, dated July 18, 1931', and sealed it and handed it to him. Mr. Baird went out and Earl and I went into my reception room and sat down and I asked him about his health or asked him what was the matter with him, and he said, 'Well my nerves are all shot to pieces.' I asked him if he had consulted a Doctor and he said 'Yes, Dr. Ingram has been treating me.' We talked on that way for quite a little while and he left and took the will with him. As he arose to go out he says, 'Well what shall I do with the other will? Shall I destroy it, burn it, tear it up?' I asked him if he had another will and he said yes and my recollection is that he said it was in his safety deposit box. I told him it made no difference inasmuch as this will revoked all former wills, but I think I said, 'It isn't always well to have too many wills hanging around.' But he was on his way out and made no response."

"I had occasion to observe Earl Hopkins rather closely during those last two visits to my office; I had considerable conversation with him and had occasion to observe his actions and general demeanor and I think he was of sound mind on the 18th day of July, 1931. There isn't any doubt in my mind on that point."

"I think he executed the power of attorney on June 23rd, 1931, and the only difference that I noticed in W. S. Hopkins on either of those last three visits was that he seemed somewhat depressed and was not as voluble, as jocose as usual. He wasn't laughing as he had done before. He seemed to be depressed as a man might if he had a bilious attack or something of that sort. But he manifested no particular nervousness on the day the will was executed. He sat in the chair as quietly as I am sitting here. There was no shuffling or nervous demonstration such as has been described by witness—nothing that attracted my attention in any respect."

The other witness to the will testified as follows:

"I have known Earl Hopkins for 10 or 12 years and saw him quite often. I saw him on the 18th day of July, 1931. Met him at the Cooper Building. He telephoned me and asked me to come to the Cooper Building. Said he wanted me up there for a few minutes. He was waiting for me at

the head of the stairs, and we went into Mr. George W. Jones' office. Only the three of us were there and Mr. Jones asked Earl if this 'was his last will and testament', and he said 'yes' and walked up and signed it, and we both signed it and I left. When I first went up Earl told me he wanted me to witness a will. Mr. Hopkins signed, and then Mr. Jones and I. We all signed at the same time in the presence of the testator and in the presence of each of us. In my opinion he was of sound mind when he signed that will.''

No other evidence was offered as to the mental condition of the testator at the exact time the will was executed. There was also evidence that he had his home newspapers forwarded to Santa Cruz and read them; that he had his automobile reinsured just before leaving for Santa Cruz; that he requested his brother, Dr. Hopkins, to get the bill for this insurance when the latter returned to Fresno and pay the same for him; that he asked his brother to forward his mail and also to look at his home for his glasses; and that he was able to drive his automobile before, during and after the trip to Santa Cruz. That the contestant did not consider the deceased incompetent after the will was executed is indicated by her testimony concerning the occasion when he later explained the provisions of the new will to her and she expressed her dissatisfaction therewith, at which time she plainly indicated an intention to have him change the same. She testified that around the first of July, 1931, she tried to get him to go east for his health and that he made several trips down town alone around July 18th.

While it appears that the deceased at the time of making this will was a sick man and that he was highly nervous and much depressed, the evidence is far from sufficient to show general mental incompetency or that he was not then possessed of sufficient mental capacity to be able to understand the nature of the act he was doing, or that he did not have an understanding and recollection of the nature and situation of his property and of his relations to the persons who had a natural claim upon his bounty. (*Estate of Sexton*, 199 Cal. 759 [251 Pac. 778]; *Estate of Perkins*, 195 Cal. 699 [235 Pac. 45]; *Estate of Clark*, 100 Cal. App. 357 [280 Pac. 204].)

The contestant practically concedes that the evidence is not sufficient to indicate general mental incompetency on the part of the deceased but insists that it discloses the presence of certain delusions which so affected his mind as to make it impossible for him to make a valid will. It is urged that this situation appears because certain marked changes in the actions and deportment of the deceased came about in the last few months of his life, because he changed completely the provisions of his former will, and because the will last executed was unnatural, unfair and unjust.

The delusions referred to are that he was afflicted with heart disease, that he was afflicted with cancer, that he was about to have a stroke, that he was going to die, and that in the event of his death some crook or designing person would defraud his widow out of the property which he might leave to her. It is practically conceded, as it must be, that the first three of these are not such delusions as, in themselves, could affect the terms of a will but it is earnestly insisted that the last two, taken together, constituted a delusion which not only affected the will but deprived the testator of all testamentary capacity. It is argued that before he became thus incompetent the testator entertained the deepest affection for his wife; that in 1926 he made a will giving all of his property to her; that his later fear that his widow might be defrauded was entirely groundless; that as a result of this delusion he executed the second will; and that the terms of this last will are such as to deprive the contestant of all that naturally and normally would have been given her by the testator, and in effect to cut her off with a mere pittance.

■ We are unable to agree with the contention made that this will was so unnatural and so clearly based upon a groundless fear as to have been the result of an insane delusion. There is no evidence in the record justifying the view that this fear was entirely groundless. There is evidence that the deceased knew or believed that a certain Mrs. Swift had had such an experience. The situation he feared is one that frequently occurs and in the light of common experience this fear cannot, of itself, be considered as sufficient evidence of an insane delusion. At the time the will was drawn the deceased was about sixty years of age and his wife was about forty-five. They had no chil-

dren and they married late in life. It conclusively appears that the deceased had great affection for his wife and that his biggest concern in the face of his own illness was that she be adequately cared for as long as she lived. In view of this object and of the reasonable basis that existed for his fear that designing persons might mislead her in the matter of investments, the method he adopted, of creating a trust, was not only natural and reasonable but one that might well be considered the wisest course by minds well above the line of testamentary incapacity. And after making provision for his wife for the term of her lifetime it was neither unnatural nor unreasonable that the remainder of his property, which was apparently his separate estate, should be given to members of his own family, who were natural claimants on his bounty, and especially to those who had been closest to him. While the last will is different from the first, the only difference, so far as the contestant is concerned, is one that was well calculated to more certainly protect her welfare and to insure the object which was uppermost in the mind of the testator.

In our opinion, the evidence does not sustain the finding of the jury that the deceased was of unsound mind, either as lacking testamentary capacity in general or as suffering from such a delusion as would affect and nullify his ability to make a will.

With respect to undue influence, the contestant alleged in her petition that the testator was so afflicted in mind and body that he was unable to understand or transact business; that because of this fact he relied upon and followed implicitly the directions of his brother, Dr. Hopkins, in all business transactions; that thereby Dr. Hopkins acquired and had a controlling influence over him; that Dr. Hopkins exercised this influence and control by telling him that his wife could not take care of the property of his estate but would waste and squander the same; and that Dr. Hopkins demanded that the testator devise all of his property to him in trust, for the purposes set forth in the will. We are unable to find any evidence establishing the facts thus alleged. In *Estate of Bryson,* 191 Cal. 521 [217 Pac. 525], the court said:

" 'In order to establish that a will has been executed under undue influence, it is necessary to show, not only that such

influence has been exercised, but also that it has produced an effect upon the mind of the testator by which the will he executes is not the expression of his own desires.' (*Estate of Calkins,* 112 Cal. 296 [44 Pac. 577].) . . . Proof to establish undue influence must be had of a pressure which overpowered the mind and bore down the volition of the testator at the very time the will was made. (*Estate of Carithers,* 156 Cal. 422 [105 Pac. 127].) . . . It consists in the exercise of acts or conduct by which the mind of the testator is subjugated to the will of the person operating upon it, some means taken or employed which have the effect of overcoming the free agency of the testator and constraining him to make a disposition of his property contrary to and different from what he would have done had he been permitted to follow his own inclination or judgment.''

In *Estate of Clark,* 170 Cal. 418 [149 Pac. 828], it is said: ''The fact that advice was offered to Mr. Clark taken in connection with the activity of Mrs. Straus in securing counsel for him, fails to establish that sort of undue influence which must be shown before a court will overthrow a solemnly executed will. The evidence utterly fails to reach the dignity of proof of that sort of pressure which overpowered the mind and mastered the volition of the testator at the very moment of the testamentary act. Without such proof no will should be held invalid on the ground of undue influence. (Citing cases.) ''

Again, from the *Estate of Anderson,* 185 Cal. 700 [198 Pac. 407] : ''It is not undue unless the pressure has reached a point where the mind of the person subjected to it gives way before it so that the action of such person taken in response to the pressure does not in fact represent his conviction or desire, brought about perhaps by argument and entreaty, but represents in truth but the conviction or desire of another. As was said in *Estate of Donovan,* 140 Cal. 390, 394 [73 Pac. 1081], quoting from Chaplin: 'The true test of undue influence is that it overcomes the will without convincing the judgment.' ''

The contestant maintains that undue influence was here established because the will last executed was unnatural, because it conclusively appears that it was at variance with the decedent's real testamentary intentions, and because

the brother had an opportunity to control the decedent's testamentary act. It is argued that the prior will disclosed the testator's real intentions; that the influence acquired by Dr. Hopkins over his brother is shown by the fact that the testator gave to Dr. Hopkins a general power of attorney; that Dr. Hopkins' testimony that he had not read the will and did not know what was in it is not to be believed since he carried the will home to his brother, since he had his office next door to the attorney's office and since friendly relations existed between him and his brother. It is further argued that the use of undue influence is positively shown by the testimony of one Chamberlain, who testified that he took a ride with Dr. Hopkins about the middle of May, 1931, and during the ride Dr. Hopkins said to him, ''Harry, you have a lot of influence with Carrie; why don't you see her and get her to persuade Earl to change that will? That is too much money for her to have.'' That witness further testified that he did not reply to this and that nothing further was said, and the contestant testified that Chamberlain did not tell her of this until some time after her husband's death. With reference to the power of attorney, it appears that about the 30th of June, 1931, the testator was intending to go back east and asked his attorney to prepare this power of attorney in order that his brother might look after his business while he was gone. He decided not to go east and the power of attorney was never used. We have already expressed our opinion on the claim that the will was unnatural. While the last will is somewhat at variance with the terms of the prior will, that fact does not establish that the prior will expressed the real intentions of the testator at the later date. It fully appears that the testator considered making a new will for some considerable time, that he talked of it to a number of people, that he expressed his dissatisfaction with the terms of the old will on more than one occasion, that he was worried because of what he considered the unfortunate experience of Mrs. Swift, that he asked Dr. Cooper as to the best way to provide with certainty for his wife, that he not only gave the data to his attorney for drawing the will but expressed satisfaction with it after it was drawn, and that thereafter he told his doctor that the matter was all fixed up and seemed to feel relieved. Although his wife strenuously objected to the arrangement when he told her

about the contents of the new will, the evidence indicates that he remained of the same opinion and it is certain that he made no change although he had ample time to do so. Under these circumstances, it cannot be said that the prior will expressed his real intentions at the time here in question. It is true that the contestant testified that the deceased told her that Dr. Hopkins and Dr. Cooper had told him that they had fixed their wills in this way and that they had advised him to do the same. These statements, if made by Dr. Hopkins, are far from any indication that undue influence was used. They indicate neither pressure nor coercion, especially in the light of all of the other evidence indicating that the testator had firmly made up his mind to accomplish a certain result, namely to make provision for his wife's support during the remainder of her life. The only activity on the part of Dr. Hopkins in connection with the execution of the will appears to have been that at the request of his brother, the testator, he made an appointment with the attorney, that while the testator was consulting with the attorney he entered the room and made one suggestion and that later he carried a copy of the instrument home to his brother. It fully appears that Dr. Hopkins was not present during most of the time the terms of the will were being discussed and that he was not present when it was executed. The testimony as to what occurred at the time of the execution of the will plainly indicates that the deceased knew exactly what he was doing, that he was thinking and acting for himself, that he had a reasonable purpose in mind and that he proceeded directly to that end. The most that can be said of the evidence relied upon by the contestant is that it shows an opportunity and possibly a motive, but there is nothing to indicate either that the doctor ever sought to control the making of this will or that anything done by him had the effect of overpowering the mind of the deceased and of substituting his will for that of the testator. It should be borne in mind that undue influence, as invalidating a will, is a very different thing from the general influence that naturally comes from intimate relationships and those mutual confidences which people repose in each other after long association. It may also be observed that even such evidence of opportunity and motive loses much of its effectiveness where, as here, the party charged with undue

influence had so little to gain. The remaindermen named in this will were considerably older than the contestant and under ordinary circumstances could not expect to profit by the will during their lifetime. Prior to the stock market crash in 1929 this estate would have been worth between $40,000 and $50,000. After that crash it was appraised at $26,347.98, and even under the adverse conditions existing at that time the income was approximately $100 a month, an amount equaling the income earned by the testator in the last years of his life. In our opinion, the provision made for the contestant in this will, in itself, negatives the idea that undue influence was used to poison the mind of her husband against her. While the contestant testified as to ways in which she thought Dr. Hopkins had influenced her husband, the incidents recited merely show that the testator had a high regard for the doctor's judgment on business matters. The contestant apparently realized the weakness of this evidence as she finally stated that her idea that Dr. Hopkins had exercised undue influence over her husband was based, in part, upon her "woman's intuition". So far as undue influence is concerned, we find nothing in the evidence that is inconsistent with the voluntary execution of the will by the testator. Some of the general rules applicable are thus set forth in *Estate of Carson,* 74 Cal. App. 48 [239 Pac. 364]:

"Undue influence may be established by circumstantial evidence, but ' "it must, however, do more than raise a suspicion. It must amount to proof, and such evidence has the force of proof only when circumstances are proven which are inconsistent with the claim that the will was the spontaneous act of the alleged testator. I think there is nothing beyond suspicion shown here." ' (*Estate of Anderson,* 185 Cal., at p. 709 [198 Pac. 407, 411], quoting from *Estate of McDevitt.*) 'There is no proof. Circumstances have been proven which accord with the theory of undue influence, *none of which are inconsistent with the hypothesis that the will was the free act of an intelligent mind.* This does not amount to proof, and many circumstances are shown which are wholly inconsistent with the hypothesis of undue influence, and the presumption of law, in the absence of all proof in a contest, is in favor of the will.' (Italics ours.) (*In re Calkins,* 112 Cal. 304 [44 Pac. 577], quoting from

the *Estate of McDevitt.*) We also quote the following from notes in *In re Hess* (48 Minn. 504, 51 N. W. 614), at pages 687 and 688 [of 31 Am. St. Rep.]: 'To invalidate a will on the ground of undue influence, there must be affirmative evidence of the facts from which such influence is to be inferred. It is not sufficient to show that the party benefited by the will had the motive or the opportunity to exert such influence; there must be evidence that he did exert it, and so control the actions of the testator, either by importunities which he could not resist, or by deception, fraud, or. other improper means, that the instrument is not really the will of the testator . . . The burden of proof being on those who attack a will on the ground of undue influence, it is not sufficient that they barely show that the circumstances of the will are consistent with the hypothesis of undue influence; for this would be but to create an equipoise in the testimony, and the *onus* being on the party attacking the will, he must go a step further, and show by any suitable evidence the inconsistency between circumstances of the execution of the will, and its being executed without the interposition of undue influence.' ''

The following language used in *Estate of Jones,* 117 Cal. App. 163 [4 Pac. (2d) 251], might well have been written for this case: " 'The contention of respondents, when thoroughly sifted, seems to be about this: That there is evidence to the point that appellant had a *general* influence over the deceased which ought to be classified as "undue"; and that, therefore, although when he made his will, under the circumstances above stated, he was apparently free to act as he pleased, yet it must be inferred that this general influence of appellant accompanied him, subverting his volition and coercing him to act against his real wishes. To maintain such a strained and difficult theory would require evidence very different from that presented in the record.' ''

The claim that fraud was practiced upon the deceased by Dr. Hopkins is based upon the testimony of the contestant to the effect that her husband told her a few days before they went to Santa Cruz that the will of July 18, 1931, was just the same as the old will except that he had appointed Dr. Hopkins as executor and afterwards as trustee, and that he further told her that Dr. Hopkins had told him that the new will did not change the devises and bequests

to her as provided in the old will but merely provided that the doctor should have the management of the estate. It is argued from this that it conclusively appears that the deceased believed a representation made by his brother to the effect that the new will was substantially like the old one and that this representation was false, fraudulent and resulted in the making of the new will. We think it sufficiently appears from the entire evidence that the testator fully realized the differences in the two wills and that he had a full knowledge and comprehension of just what change was made by the second will. He had worried about the best way to protect his wife from designing persons, had definitely planned to create a trust for her benefit and told his lawyer exactly what he had in mind. Although she had never seen the new will his explanation of the changes made was sufficiently lucid to arouse her strenuous objections, and it fully appears that he thoroughly understood the reasons for her disapproval and still believed he had taken the best course. The evidence not only fails to show that the testator was induced to execute the will by the misrepresentations charged, but it conclusively shows that even if made, the representation was not believed by him.

The judgment and order appealed from are reversed.

Marks, J., and Jennings, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on March 6, 1934.