[Sac. No. 6131. In Bank. Mar. 14, 1952.]

Estate of VIVIAN LINGENFELTER, Deceased. LENORE
DeARMOND, Respondent, v. MADGE TUCKER et al.,
Appellants.

574

Brobeck, Phleger & Harrison, Hewitt & McBride and Gregory Harrison for Appellants.

Robert W. Steel, Ray Manwell and Erling S. Norby for Respondent.

EDMONDS, J.—Madge Tucker, sister of Homer Lingenfelter, proposed for probate the purported will of Vivian Lingenfelter, his deceased widow. The contest of Lenore DeArmond is based upon the asserted incompetency of the testatrix. It is also charged that the will was executed as the result of duress and undue influence exercised by the proponent and her husband. The appeal is from a judgment entered upon a verdict in favor of the contestant and from an order denying a motion for judgment notwithstanding the verdict.

Homer Lingenfelter was an attorney practicing in partnership with Arthur Powell. On the day Vivian executed the purported will, Homer was seriously ill. He died the following day. One week later, Vivian committed suicide.

Powell was called as a witness by both the proponent and the contestant. As Lenore's witness, he testified concerning the execution of the will. Vivian came to see him, he said, accompanied by Madge, who had been staying with her during Homer's illness. Powell was not in his office when the two women arrived. Upon his return shortly thereafter, he found Vivian and Madge waiting for him in his reception room. Powell asked about Homer and Vivian said that he looked better.

Vivian and Powell went into his private office and closed the door. Madge remained in the reception room. Vivian handed Powell a paper which purported to be her holographic will. He testified that she wanted to know "if it is a good will legally." That instrument, he said, made bequests to a number of friends and acquaintances. It also included a provision for the care of a pet cat. Powell read the document aloud. As he mentioned each of its provisions, Vivian made some comment, expressing in virtually every instance her reasons for the bequest.

According to Powell, by the document Vivian gave the residue of the estate to Madge and her husband. Powell testified that when he read that clause, Vivian said, "They are only my in laws but they have always helped Homer and myself when we have needed them most and they have done more for me than my own family ever has."

Powell testified that he called to her attention the omission of any provision for Homer. Her reply, he said, was that, because Homer was so very ill, "she didn't expect him to make it and in any event she didn't have much of anything of her own." The situation, as Powell explained it, was that

"we had really written Homer off." Powell also testified that Vivian told him she omitted her brothers from her will because one had obtained her share of her mother's estate and the other was adequately cared for.

In other conversations related by Powell, he said that they discussed her property and Homer's separate property. He explained to her that she could will one half of the community property of herself and Homer. "She understood if anything happened to one first the other would get" the marital home which was held in joint tenancy. She told Powell that she had no bank account of her own, only a joint account with Homer for household purposes. They also discussed Homer's life insurance. Powell admitted that he did not mention the value of the accounts receivable on the books of the law partnership.

In answer to a question whether he believed Vivian was capable of writing an introductory clause to a will such as that in the holographic instrument, Powell stated: "I believe she could on either of one or two conditions; one if Homer had helped her, or two, if she was going by another will, but it was pretty letter perfect."

Vivian asked Powell to have the document she had written prepared as an attested will, naming Madge as executrix. Certain other minor changes were to be made, such as a more specific provision for care of the cat. Powell testified that he dictated a formal will, using the handwritten document and some notes which he had taken during the conversation as a memorandum. When testifying, Powell could not remember whether the purported holographic will had been dated. He also could not recall what he had done with that document or with his notes, although he had searched for them in his office after Lenore's attorney had asked him to preserve "all Lingenfelter wills."

While the formal will was being prepared, Vivian and Madge left the office and walked about town. Upon their return, Madge remained in the reception room while Vivian went into Powell's private office and executed the will. At that time, Powell told the jury, "very definitely" Vivian was of sound mind. The other attesting witness to the will testified to the same effect.

A number of witnesses described Vivian as being a highly emotional and unstable person. According to the evidence, she would become upset on the slightest provocation. When upset, she would "disintegrate emotionally." She would

scream and yell, her eyes would become glassy, she would weep uncontrollably and be beyond the reach of reason. She could have her mind diverted from whatever was bothering her at the moment by talk of something else.

There is also testimony that Vivian was a person of very weak will, easily led and very susceptible to suggestions. She was almost completely dependent upon Homer and unable to manage for herself her own shopping and ordinary routine of life. She could not cope with any unusual situation such as illness, which demanded extra energy or more responsibility, and had to have help to meet it.

Among other subjects which seemed to upset Vivian were relatives, politics, Franco, Stalin, and the stability of the economic system of the world and of the United States. When emotionally disturbed, she would become extremely excited and abusive of anyone who did not share her views. She was jealous of Homer, and during one tantrum of several days' duration she procured a gun. Her suspicions of Homer's infidelity were unwarranted.

Dr. Bone, who had treated Vivian as recently as one week prior to her execution of the will, testified that she was unwell from the time he first knew her. He said she was an advanced psychoneurotic and a borderline case between sanity and insanity in a medical sense. In his opinion, she could be of unsound mind under the stress of excitement, anger or fear. Dr. Kimmel, long Vivian's physician, testified that she was of sound mind, but psychoneurotic to the extent of being barely able to manage her household.

Mrs. Valetta Morton, who saw Vivian between the two visits to Powell's office, testified that her conversation at that time did not make sense. As stated by this witness: "Well, she was talking about Mr. Lingenfelter being in the hospital one minute. Then she asked me to feel her back and maybe her neck, and to explain she said she was like being in a board, just as stiff as a board, and she said 'I have this severe pain in my head at all times.' Then she would take her glasses, take them off and put them on and raise them up and pull them down, and her eyes looked very glassy." In Mrs. Morton's opinion, Vivian was of unsound mind at that time.

Mrs. Norby testified that when she saw Vivian a day or two after Homer's death Vivian was very upset. Vivian was perspiring, her hands were shaking, she was gray in the

face and hesitant in talking. She cried and hung on to Mrs. Norby and talked "like anyone that is in grief." In the opinion of this witness, Vivian had always been of unsound mind and was in that condition at the time of the conversation related to the jury.

Another of Vivian's friends, Marie Countryman, told of attempts to talk with Vivian about the time of Homer's illness. She stated that while Homer was ill, she tried to call Vivian on the telephone. The call was answered by an unidentified woman, who said "that Vivian was reading or was not able to talk." After Homer died, the witness called at the Lingenfelter home but no one answered the door. She again telephoned and the person who answered asked her "to wait a while . . . To wait, not to come out." A day or two after Homer died, Mrs. Norby visited Vivian at her home. Also, the day after Homer died, Lenore talked to Vivian on the telephone.

According to several witnesses, Vivian often had stated that she considered Madge domineering and greedy. Vivian claimed that Madge had gotten the best of a deal with Homer in connection with their mother's estate. Two weeks before Homer's death, Vivian had said that she did not want Madge to come to her home because she was too domineering. There is testimony quoting Vivian as saying that the Tuckers consistently were conniving to get the Lingenfelter money. The record shows that Vivian expressed her dislike of Madge with screaming and yelling.

Over Madge's objection, evidence was admitted concerning Homer's statements in regard to her and Lenore. This testimony was to the effect that Homer considered the Tuckers to be "money minded," domineering and completely mercenary. As the witnesses related the conversations, he described relations between himself and Madge as a case of "dog eat dog," and said that Madge had "hogged their father's estate." Homer was very bitter because of Madge's treatment of their mother, whom he said she had killed. He especially hated Madge's husband, called him names, and said that he and Madge never would get a penny of his money.

For many years and at the time of his death, the contestant was Homer's secretary. Testimony on her behalf is to the effect that he was most appreciative of her services. The jury was told of conversations in which Homer had said that, when he was starting to practice law, she had worked

at a very small salary; she deserved everything he could do to help her and Vivian felt the same way. Other statements attributed to Homer were that, because Lenore had never been paid enough for her services, by his and Vivian's wills she would be taken care of and education provided for her child. Several witnesses were permitted to testify, over objection, as to Homer's declarations of his testamentary provisions.

Lenore testified that in 1937 Vivian executed a will naming Homer as principal beneficiary. Under this will, the contingent beneficiaries were a college, Marie Countryman, and Lenore. The witness also stated that at the same time, Homer executed a will naming Vivian as principal beneficiary and Lenore as the sole contingent beneficiary. Another will of Vivian's made in 1946, was received in evidence. It named as contingent beneficiaries Lenore, Pauline Garewal and the college which was a beneficiary under the 1937 will.

According to the evidence, Vivian often had spoken to intimate acquaintances concerning the testamentary provisions she and Homer had made in their various wills. As stated by one witness, about two weeks before Homer died, Vivian said that her and Homer's wills were written just the way they wanted them. Over objections, his will, which named Lenore as contingent beneficiary and executrix, was admitted into evidence.

It appears that Madge had visited the Lingenfelters occasionally, and corresponded with Homer, but there is no evidence of constant association. On several occasions during Homer's illnesses, Madge came to the Lingenfelters' home at their request and helped in caring for Homer and running the household. By telegram, during Homer's last illness, Vivian asked Madge to come for that purpose. Madge arrived 10 days before Homer's death and stayed with Vivian until shortly before the suicide.

Upon this and other evidence, the jury returned a verdict in favor of Lenore upon each of the two grounds of contest. Thereafter a motion for judgment notwithstanding the verdict was denied. The appeal is from the judgment entered on the verdict and also from the order denying the motion.

The proponent of the will asserts that the evidence is insufficient to sustain the jury's verdict either that Vivian was of unsound mind at the time she executed it or that it was procured by undue influence. Also, it is claimed that prejudicial error resulted from the admission into evidence

of Homer's hearsay statements and the certificate showing Vivian's brother's commitment to a hospital for mental diseases. Another point relied upon is that Vivian's hearsay statements were admitted in evidence to prove the truth of facts asserted in such statements. Rulings characterized as being prejudicially erroneous concern certain instructions which were given to the jury and the refusal of other instructions.

Lenore takes the position that the evidence fully supports the jury's verdict upon each ground of contest. She declares that the court correctly ruled upon the admission of evidence and the instructions.

More specifically, Lenore argues, from the evidence the jury had a right to believe that Vivian did not comprehend the nature of her testamentary act. The record fully supports the implied finding, it is said, that at the time Vivian executed the will she was not aware of the character and extent of her property nor did she have in mind the persons who were the natural objects of her bounty.

Accepting that construction of the evidence most favorable to Lenore, it shows no lack of testamentary capacity at the time of the execution of the will presented for probate. There is testimony concerning isolated acts, foibles, idiosyncrasies, mental irregularities or departures from the normal which do not bear directly upon and influence the testamentary act. But much more than that is required to set aside bequests of property. "The actual mental condition of the decedent at the time of the execution of the will is the question to be determined upon a contest based on his alleged incompetency and evidence tending to show unsoundness of mind either before or after the execution of the will is important only in so far as it tends to show mental condition at the time of the execution of the will. . . . To overcome the presumption of sanity the contestant must show affirmatively and by a preponderance of the evidence that the testator was of unsound mind at the time he executed his will." (*Estate of Smith*, 200 Cal. 152, 158 [252 P. 325].)

The only testimony bearing upon Vivian's state of mind at the time of the execution of the will was that of Powell, the attorney who drew the will, and the other attesting witness. Both declared that Vivian was of sound mind at the time of execution of the will. None of the evidence offered to support a contrary determination indicates a mental con-

dition which deprived Vivian of testamentary capacity at the time the will was executed.

The most that can be drawn from all of the accounts of her conduct is that she was ill, weak, highly nervous and· excitable, and prone to violent outbursts of neurotic temper. The acts which led certain witnesses to express the opinion that she was of unsound mind had no bearing upon her testamentary capacity. Even Mrs. Morton's description of Vivian at a time shortly before the will was executed, shows no more than Vivian's nervousness and concern with the health of herself and her husband. It does not tend to prove mental degeneration denoting incapacity to understand the testamentary act. Mrs. Norby's testimony shows only Vivian's deep grief caused by the loss of her husband.

"Every mental departure from the normal will not destroy a testamentary disposition, . . . Mental derangement sufficient to invalidate a will must be insanity in one of two forms: (1) insanity of such broad character as to establish mental incompetency generally, or (2) some specific and narrower form of insanity under which the testator is the victim of some hallucination or delusion. Even in the latter class of cases, it is not sufficient merely to establish that a testator was the victim of some hallucination or delusion. The evidence must establish that the will itself was the creature or product of such hallucination or delusion; that the hallucination or delusion bore directly upon and influenced the creation and terms of the testamentary instrument." (*Estate of Perkins,* 195 Cal. 699, 703-704 [235 P. 45]; *Estate of Arnold,* 16 Cal.2d 573, 585 [107 P.2d 25].)

"Testamentary capacity cannot be destroyed by showing a few isolated acts, foibles, idiosyncrasies, moral or mental irregularities or departures from the normal unless they directly bear upon and have influenced the testamentary act." (*Estate of Wright,* 7 Cal.2d 348, 356 [60 P.2d 434]; *Estate of Selb,* 84 Cal.App.2d 46, 49 [190 P.2d 277]; *Estate of Arnold, supra,* p. 586.) The fact that Vivian committed suicide is relevant upon the question of sanity, but standing alone it is insufficient to show an insanity so complete as to destroy testamentary capacity. (*Estate of Finkler,* 3 Cal.2d 584, 595 [46 P.2d 149]; *Estate of Rich,* 79 Cal. App.2d 22, 30 [179 P.2d 373].)

Likewise there is no evidence that Vivian suffered from an insane delusion which influenced her will. Unquestionably she was extremely jealous of, and very much in love

with, Homer. According to some witnesses, Homer's teasing occasionally had set Vivian off on one of her rages. At other times, coincidental circumstances aroused her jealousy. But this jealousy has not been connected with Vivian's testamentary disposition in any way. Moreover, her jealousy was not a delusion, for it was based upon conduct which had a tendency to create her momentary beliefs. (*Estate of Alegria,* 87 Cal.App.2d 645, 655 [197 P.2d 571].)

Vivian's other prejudices also fail to establish any delusion. None of them in any way bears upon her testamentary disposition. ■■ "Care must be taken to differentiate between mere unreasonable opinions and mental derangements. Testamentary capacity does not depend upon the testatrix' ability to reason logically or upon her freedom from prejudice. A belief may be illogical or preposterous, but it is not, therefore, evidence of insanity." (*Estate of Perkins, supra,* p. 708.)

■■ "A testator is of sound and disposing mind and memory if, at the time of making his will, he has sufficient mental capacity to be able to understand the nature of the act he is doing, and to understand and recollect the nature and situation of his property and to remember, and understand his relations to, the persons who have claims upon his bounty and whose interests are affected. by the provisions of the instrument." (*Estate of Smith, supra; Estate of Arnold, supra,* p. 586; *Estate of Sexton,* 199 Cal. 759, 768 [251 P. 778].)

■■ A complete answer to the charge that Vivian did not comprehend the nature of her testamentary act is the uncontradicted evidence showing that she knew exactly what she was doing. She set down her wishes in her own handwriting in the form of a holographic will. Then she sought legal advice as to whether it was a "good will legally." She discussed the provisions of the will with her attorney, explaining the reason for each of them. After she had executed her formal will and left Powell's office, she returned, and asked him to destroy her other will. Nothing in her previous or later conduct indicates that, at any time, she did not fully understand the consequences of her bequests.

■■ The record is also without contradiction that Vivian fully comprehended the nature and situation of her property. The only testimony in this regard is that of Powell. It shows that, for a woman unaccustomed to business dealings, she had a surprisingly good grasp of her property interests. She

understood that, outside of the assets of the law partnership, very little would pass under her will while Homer lived. She took into consideration the insurance involved. She understood the nature of the joint tenancy in the house. She mentioned that she had no bank account of her own, only a joint account with Homer for household purposes.

Lenore argues that Vivian was not aware of the character and extent of her property because she did not take into consideration the accounts receivable of the law firm. Conceding this fact, it does not show any failure to understand the nature of her property. In their conversations, as recounted by Powell, she said "Homer had told her he was drawn up pretty well to take care of his doctor bills and expenses and I mentioned I had been drawing up pretty well also because I was building a home, and the general understanding was that there wasn't too much in the partnership account."

Powell testified: "Personally, I forgot to mention anything about the accounts receivable and didn't consider them or anything like that, and I had no reason to go ahead and estimate them because they weren't due." Apparently Powell was exceedingly generous in his inclusion in Homer's estate of accounts receivable which were not earned until a considerable period of time following Homer's death. That Vivian failed to estimate with detailed accuracy the value of accounts receivable which were largely unearned at the time does not show that she lacked understanding of her interest in the partnership to the extent of the community property involved. The very discussion of the standing of the partners' drawing accounts indicates that she considered the partnership interest in making her will.

Lenore also points to the omission from the will of provision for Homer and for Vivian's brothers as proof that Vivian did not have in mind the persons who were the natural objects of her bounty. However, as was said in *Estate of Nolan,* 25 Cal.App.2d 738, 741 [78 P.2d 456], the "unnatural" provisions of a will are "an element supporting an *inference* of undue influence when the testament is attacked on that ground, and (are) of like value when it is claimed that the testator was laboring under hallucinations which had caused him to make an unreasonable or unjust discrimination against some of his heirs at law. But, when mental incapacity is the ground of attack, the dispository clauses of the will are not, in and of themselves, *evidence* of

mental incapacity which would overcome the presumption of sanity and competence.''

When Vivian discussed the provisions of her proposed will with Powell, she told him that she made no provision for Homer because she did not expect him to live long. Powell mentioned her brothers. Vivian answered, ''You know how I feel about Waldo after he got my share of my mother's estate.'' As to Earl, she said that he was taken care of. As Powell knew, Earl was an incompetent in a Veterans' Administration hospital.

Lenore points to the testimony of Anne Norby as proof that Vivian did not have in mind the natural objects of her bounty. Concerning a conversation with Vivian a day or two after Homer's death, Mrs. Norby said that she asked whether Vivian had notified her brothers. According to Mrs. Norby, ''she just looked at me and said, 'I don't know where they are.' She added that she hadn't heard from one for seven years.'' Such testimony does not show that Vivian did not have her brothers in mind. At most, it explains in part her failure to provide for them and indicates that there was an estrangement of long standing.

Lenore further argues that the will was ''unnatural'' because it omitted beneficiaries who had been included in earlier wills. These beneficiaries were not related to Vivian, and were not the ''natural objects of her bounty'' in the generally accepted sense of the term. That Vivian changed her will, as she had a right to do, is not evidence of mental incapacity, although her act in that regard may be relevant upon the issue of undue influence. At most, this change is ''an additional circumstance entitled to some weight in connection with the other facts shown.'' (*Estate of Strachan,* 166 Cal. 162, 166 [135 P. 296].)

Upon the issue of undue influence, it is argued that Vivian's condition was such as to permit a subversion of her freedom of will, that Madge had an opportunity to control the testamentary act and was active in procuring the execution of the will, that the provisions of the will are unnatural and at variance with preexisting testamentary intentions, and that the Tuckers benefited unduly by the provisions of the will. Again accepting as true all of the evidence most favorable to Lenore's position, there was no confidential relationship between Vivian and Madge. Lenore does not claim that there was such relationship, and, in view of the testimony which Lenore introduced showing Vivian's distrust and dislike of

Madge, Lenore could not well claim that a confidential relationship existed. (*Estate of Llewellyn,* 83 Cal.App.2d 534, 562 [189 P.2d 822, 191 P.2d 419].) ▮ Consanguinity of itself does not create a fiduciary relationship. (*Estate of Llewellyn, supra.*) A like rule must apply to affinity. Lacking any confidential relationship, there is no presumption of undue influence.

▮ The indicia of undue influence have been stated as follows: "(1) The provisions of the will were unnatural. . . . (2) the dispositions of the will were at variance with the intentions of the decedent, expressed both before and after its execution; (3) the relations existing between the chief beneficiaries and the decedent afforded to the former an opportunity to control the testamentary act; (4) the decedent's mental and physical condition was such as to permit a subversion of his freedom of will; and (5) the chief beneficiaries under the will were active in procuring the instrument to be executed." (*Estate of Yale,* 214 Cal. 115, 122 [4 P.2d 153].) These, coupled with a confidential relationship between at least one of the chief beneficiaries and the testator, altogether were held "sufficient to shift the burden to the proponents of the will to establish an absence of undue influence and coercion and to require the issues to be determined by the jury." (*Estate of Yale, supra,* p. 123.)

In *Estate of Graves,* 202 Cal. 258, 262 [259 P. 935], it was said that the following facts, among others, are recognized as indicative of undue influence: "The relations between appellant and the decedent afforded to appellant an opportunity to control the testamentary act; the decedent's condition was such as to permit of a subversion of her freedom of will; the appellant was active in procuring the instrument to be executed. In addition, appellant unduly profited as beneficiary under the will. While none of these circumstances, standing alone, has the effect of creating a presumption against the validity of the instrument, their probative force, in combination, is to impose upon the proponent the obligation of presenting evidence of volition, and to make the question as to undue influence one of fact for the jury's determination."

▮ Conceding that the provisions of Vivian's will were unnatural, that its dispositions were at variance with Vivian's preexisting testamentary intentions, that Madge had an opportunity to subvert Vivian's will and that Vivian's condition was such as to permit of a subversion of her freedom of will, and that Madge and her husband benefited by the provisions

of the will, there still is no proof of undue influence. Evidence of activity by Madge in procuring execution of the will is entirely lacking.

 Active participation in procuring the execution of the will cannot be inferred from the fact that Madge accompanied Vivian to Powell's office, in the absence of any indication that Vivian went there at Madge's instigation or request, or that Vivian was not acting entirely in accord with her own desire. (*Estate of Morcel*, 162 Cal. 188, 197 [121 P. 733]; *Estate of Easton*, 140 Cal.App. 367, 376 [35 P.2d 614].) Lenore suggests that the purported holographic will which Vivian took to Powell had been dictated by Madge. In that connection she points to Powell's opinion that its legal sufficiency was beyond Vivian's capacity and assumes that the will was written after Homer was admitted to the hospital. The inference that the holographic will was composed during the period that Madge was staying with Vivian has no support whatever in the evidence. There is no showing as to when the holographic will was composed or dated.

 Lenore also points to testimony that Vivian's friends were requested by Madge not to visit her or to talk to her on the telephone as evidence of Madge's activity in procuring the will. The most that can be inferred from the testimony is that Madge attempted to protect Vivian from visitors during a period when she was under stress. Vivian did have visitors, and did talk to callers on the telephone. Once, Madge suggested to a caller that she should "wait a while" before visiting. At one time, a visitor found no one at home, or a telephone call was unanswered. There is no testimony that any friend was flatly denied permission to see or talk to Vivian.

 To overturn a will on the ground of undue influence, not only must there be evidence of activity on the part of the beneficiary, it also "is necessary to show that the influence was such as, in effect, to destroy the testator's free agency and substitute for his own another person's will. . . . Evidence must be produced that pressure was brought to bear directly upon the testamentary act . . . mere opportunity to influence the mind of the testator, even coupled with an interest or a motive to do so, is not sufficient." (*Estate of Arnold, supra,* p. 577.)

"The unbroken rule in this state is that the courts must refuse to set aside the solemnly executed will of a deceased person upon the ground of undue influence unless there be proof of 'a pressure which overpowered the mind and bore

down the volition of the testator at the very time the will was made.' '' (*Estate of Gleason,* 164 Cal. 756, 765 [130 P. 872]; *Estate of Carithers,* 156 Cal. 422, 428 [105 P. 127].) No such showing is made by the evidence in this case.

The ruling denying the motion for judgment notwithstanding the verdict being a nonappealable order, the purported appeal therefrom is dismissed. (*Estate of Green,* 25 Cal.2d 535, 545 [154 P.2d 692]; *Estate of Frank,* 102 Cal. App.2d 126, 132 [226 P.2d 767]; Prob. Code, § 1240.) The judgment denying probate of the proposed will is reversed.

Gibson, C. J., Shenk, J., Traynor, J., and Spence, J., concurred.

SCHAUER, J.—I dissent. In my view the evidence is not as a matter of law insufficient to sustain the verdict. The jury were not, as it seems to me the majority opinion indicates, bound to accept as true the evidence favoring the proponent. Disregarding the evidence favoring the proponent, insofar as there is impeachment or conflict, and construing all of the evidence and drawing all permissible inferences in favor of the contestant, I think the jury were justified in believing that the will as offered was not the free, voluntary and rational act of a competent testatrix. The majority opinion, I think, impliedly accepts as true all evidence favoring the proponent and unduly limits the inferences which may (and should properly) be drawn in favor of supporting the verdict.

For instance, the testimony that Vivian was a highly emotional and unstable person who on the slightest provocation would become upset, "disintegrate emotionally," scream and yell, and be beyond the reach of reason; that she was of very weak will, easily led and very susceptible to suggestions; that she was an advanced psychoneurotic and borderline case between sanity and insanity in a medical sense, and could be of unsound mind under the stress of excitement, anger or fear; that on the same day as, and at a time between, the two visits to Powell's office her conversation did not make sense, her eyes looked glassy, and in the witness' opinion she was of unsound mind; that in another witness' opinion Vivian was of unsound mind and was in that condition a day or two after Homer's death; that Vivian often had stated and indicated her dislike for the Tuckers, and had said the Tuckers were conniving to get the Lingenfelter money; that she had been dependent upon her husband, Homer, not only in mat-

ters of business but in the ordinary routine of life; that she could not cope with any unusual situation, such as illness; that at the time of execution of the disputed will Homer was, and was known by Vivian to be, in his last illness; coupled with the facts that Madge Tucker had been staying with Vivian during Homer's illness, that she prevented friends from contacting Vivian during the critical period, that she accompanied Vivian on both of the visits to Powell's office, and that the provisions of the' will here involved were contrary to those of prior wills made by Vivian and Homer and contrary to their oft-expressed plans and contrary to a statement by Vivian made only two weeks before Homer's death (and four days prior to Madge's arrival and opportunity for continuing influence) that their wills were just as they wanted them, all considered together, in my view supports permissible inferences that Vivian was not fully competent to make a valid will, was susceptible to influence and was unduly influenced by Madge, and that the will in question was not Vivian's free, voluntary and rational act. If, as the medical expert testified, she could be of unsound mind under the stress of excitement or fear, it would be logical that such condition obtained during the days of Homer's last illness; surely the stress of that period (which culminated in her making the disputed will and committing suicide) was more than the "slight provocation" which ordinarily caused her to "disintegrate emotionally" and be "beyond the reach of reason."

Because under the circumstances of this case no useful purpose would be served by discussing in this dissent issues of law not relied upon in the majority opinion I do not consider them.

Upon the issues discussed in the majority opinion I would resolve the conflict in favor of sustaining the verdict and affirm the judgment.

CARTER, J.—I dissent.

I agree with Mr. Justice Schauer that the evidence produced at the trial of this case is sufficient to sustain the findings of the jury that decedent was of unsound mind at the time the will in question was executed and that the execution of the will was the result of the undue influence of appellants.

It should be remembered that in this case we have not only the verdict of the jury holding the will invalid on both the above mentioned grounds but we have the rulings of

the trial judge denying, first, a motion for a nonsuit; second, a motion for a directed verdict; third, a motion for judgment notwithstanding the verdict; and fourth, a motion for a new trial. We also have the unanimous opinion of the District Court of Appeal holding that the evidence is sufficient to support the finding of unsoundness of mind but that the evidence is insufficient as a matter of law to support the finding of undue influence. · (See *Estate of Lingenfelter,* decided July 12, 1951 *(Cal.App.) 234 P.2d 125.) Now a majority of this court holds that the evidence is insufficient as a matter of law to sustain the finding of either unsoundness of mind or of undue influence. In so holding the majority of this court has, in my opinion, gone farther in this case than in any other reported decision in usurping the function of the triers of fact, and has in effect placed itself in the position of the trier of fact in weighing the evidence and passing upon the credibility of the witnesses.

A statute of this state expressly provides that: "Any issue of fact involving . . . the due execution and attestation of the will, or any other question substantially affecting the validity of the will, *must be tried by a jury* unless a jury is waived. . . ." (Italics added.) (Prob. Code, § 371.) The force and effect of this statute was recently emphasized by a unanimous decision of this court in the case of *Swift* v. *Superior Court,* S. F. No. 18503, decided March 7, 1952. But of what value is the right to have an issue of fact tried by a jury if a majority of this court is to usurp the function of the jury in weighing the evidence and passing upon the credibility of the witnesses as this court has done in this case? The answer is obvious. The effect of the majority decision in this case makes the above cited statute a dead letter, and emphasizes the oft-repeated statement by critics of our judicial system that the result in any case depends not upon the law as declared by the Legislature or prior decisions of the courts, but upon the philosophy or point of view of the majority who compose the court of last resort. In other words, we have a government of men and not of law.

I have heretofore stated that the majority decision in this case goes farther in disregarding the determination of the fact finding body than any other decision because it not only nullifies the determination of the jury that Vivian Lingenfelter was of unsound mind when she executed the will in

*A hearing by the Supreme Court was granted on Sept. 7, 1951.

question and was acting under the undue influence of the appellants, but it also disregards the rulings of the trial judge sustaining those findings and the holding of the District Court of Appeal as to the sufficiency of the evidence to support the finding of unsoundness of mind.

Without attempting to review all of the decisions of this court and the District Courts of Appeal which have refused to sustain the findings of juries that wills executed by testators were invalid because of their unsoundness of mind or were procured by undue influence, my review of these decisions discloses that in almost every case where this court has refused to accept the determination of the jury in cases such as this, either the trial court had granted a motion for judgment notwithstanding the verdict or the District Court of Appeal had reversed a judgment based upon a jury verdict vacating and setting aside the will. In *Estate of Arnold*, 16 Cal.2d 573 [107 P.2d 25], the trial court had granted a motion for judgment notwithstanding the verdict, the District Court of Appeal affirmed and this court likewise affirmed by a divided court. The same is true of *Estate of Finkler*, 3 Cal. 2d 584 [46 P.2d 149]. In *Estate of Llewellyn*, 83 Cal.App.2d 534 [189 P.2d 822, 191 P.2d 419], *Estate of Russell*, 80 Cal. App.2d 711 [182 P.2d 318], *Estate of Agnew*, 65 Cal.App.2d 553 [151 P.2d 126] and *Estate of Hopkins*, 136 Cal.App. 590 [29 P.2d 249], this court denied petitions for a hearing after a unanimous decision by the District Court of Appeal reversing the judgment in each of said cases. In *Estate of Wright*, 7 Cal.2d 348 [60 P.2d 434], this court by a bare majority of four justices reversed a judgment holding a will invalid on the sole ground of testamentary incapacity where the trial court denied a motion for judgment notwithstanding the verdict which determined that the deceased was of unsound mind at the time the will was executed. All of the foregoing cases hold that the evidence upon which the verdict was based was insufficient to show either unsoundness of mind or undue influence, although, to my mind, the conclusion reached by this court in each of said cases was based upon reasoning in conflict with the general rule that in cases where a trial by jury is a matter of right, all questions as to the weight of evidence and credibility of witnesses are within the sole province of the jury. There can be no doubt that the trend of decision both by this court and the District Courts of Appeal in will contest cases has been in direct conflict with the last mentioned settled rule which is generally applied in cases

other than those involving a will contest. Yet, we find in nearly every decision of this court and the District Courts of Appeal in will contest cases the statement that the appellate courts of this state are bound by the conflict of evidence rule and that questions as to the weight of the evidence and credibility of the witnesses are for the determination of the trier of fact. I think that any unbiased mind after reviewing these decisions will agree with me that in the decisions above referred to the conflict of evidence rule has not been applied and that this court and the District Courts of Appeal in deciding those cases have simply given lip service to that rule and then disregarded it in reaching its conclusion. Such is the situation in the case at bar.

*Estate of Teel*, 25 Cal.2d 520 [154 P.2d 384], marks a clear departure from the rule followed in the cases hereinabove cited and similar cases. In the last cited case this court said, at page 525: ''Proponent on the other hand produced an array of witnesses who testified as to the soundness of decedent's mind and contradicted other evidence offered by contestant. Attorneys with whom decedent consulted during 1940 regarding the disposition of her property including Mr. Ricks, the draftsman of the will, and other persons acquainted with her, testified that her mind was sound. Evidence is pointed to which it is asserted explains the instances of decedent's conduct above referred to. The value or credibility of those explanations was for the trier of fact. Reference is made to evidence that she handled her first husband's business affairs for many years, he being blind, and that she was a careful and cautious business woman. To review those conflicts is not the function of this court. *The trier of fact is the sole judge of the credibility and weight of the evidence in a will contest the same as in any other case. (Estate of Bristol,* 23 Cal.2d 221 [143 P.2d 689]; *Estate of Miller,* 16 Cal.App.2d 154 [60 P.2d 498]; *Estate of Ramey,* 62 Cal.App. 413 [217 P. 135]; *Estate of Gill,* 14 Cal.App.2d 526 [58 P.2d 734]; *Estate of Doolittle,* 153 Cal. 29 [94 P. 240]; *Estate of Snowball,* 157 Cal. 301 [107 P. 598]; *Estate of Cashion,* 27 Cal.App.2d 689 [81 P.2d 628]; *Estate of Allan,* 15 Cal.App. 2d 272 [59 P.2d 425]; *Estate of Caspar,* 172 Cal. 147 [155 P. 631]; *Estate of Arnold,* 147 Cal. 583 [82 P. 252]; *Estate of Webster,* 43 Cal.App.2d 6 [110 P.2d 81, 111 P.2d 355]; *Estate of Ross,* 199 Cal. 641 [250 P. 676]; *Estate of Johnson,* 200 Cal. 299 [252 P. 1049]; *Estate of Barr,* 69 Cal.App. 16 [230 P. 181]; *Estate of Russell,* 189 Cal. 759 [210 P. 249].)*

An excellent statement of the rule appears in *Estate of Bristol, supra.* Although the issue was whether a codicil had been destroyed by the testator, the general rule is stated at page 223:

" 'The rules of evidence, the weight to be accorded to the evidence, and the province of a reviewing court, are the same in a will contest as in any other civil case. . . . The rule as to our province is: "In reviewing the evidence . . . all conflicts must be resolved in favor of the respondent, and all legitimate and reasonable inferences indulged in to uphold the verdict if possible. It is an elementary . . . principle of law, that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any *substantial* evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court." (Italics added.) . . . The rule quoted is as applicable in reviewing the findings of a judge as it is when considering a jury's verdict. The critical word in the definition is "substantial"; it is a door which can lead as readily to abuse as to practical or enlightened justice.'

"A somewhat different theory was expressed in *Estate of Casarotti,* 184 Cal. 73, 78 [192 P. 1085], where this court said: 'The testimony of proponent's witnesses must be taken into account in weighing the sufficiency of contestant's case. Evidence which standing by itself might be sufficient to sustain a verdict may in the light of all the facts be wholly inadequate, and that without invading the province of the jury as the judges of the weight and sufficiency of the evidence.' This statement was quoted in *Estate of McDonough,* 200 Cal. 57 [251 P. 916]. The last quoted excerpt cannot be considered as an accurate statement of the law inasmuch as it is contrary to the foregoing declaration in *Estate of Bristol, supra,* which has been announced so frequently that it must be considered as controlling. Of course, all of the evidence must be examined, but it is not weighed. All of the evidence most favorable to the respondent must be accepted as true, and that unfavorable discarded as not having sufficient verity to be accepted by the trier of fact. If the evidence so viewed is sufficient as a matter of law, the judgment must be affirmed."
I submit that the majority opinion in the case at bar is in direct conflict with the foregoing declaration by this court.

As Mr. Justice Schauer has made a correct summation of the evidence in his dissenting opinion in this case I shall not attempt to do so, but wish to add my unqualified concurrence with his statement that the evidence disclosed by the record is amply sufficient to sustain the findings of the jury as to the invalidity of the will.

I would, therefore, affirm the judgment denying probate of the will here involved.

Respondent's petition for a rehearing was denied April 3, 1952. Carter, J., and Schauer, J., were of the opinion that the petition should be granted.